IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| ENRIQUE ALVARADO, | § | |
| | § | |
| Plaintiff, | § | |
| vs. | § | Civil Action No. L-07-140 |
| | § | |
| BRIAN GORTON and UNION PACIFIC | § | |
| RAILROAD CO., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending are both parties' motions for summary judgment. (Dkt. Nos. 30, 35.) Having considered the briefs, the evidence, and the applicable law, the motions are DENIED.

## PROCEDURAL BACKGROUND

This lawsuit was filed on September 17, 2007, in the 111th Judicial District Court, Webb County, Texas. (Dkt. 1, at 5.) In his original petition, Enrique Alvarado ("Alvarado") brought claims against his employer, Union Pacific Railroad ("Union Pacific"), for age, national origin, and retaliation discrimination in violation of the Texas Commission on Human Rights Act ("TCHRA"). (Id. at 10); see TEX. LAB. CODE ANN. §§ 21.051, 21.055 (West 2006). He also brought a defamation claim against both Union Pacific and Brian Gorton ("Gorton"), a Union Pacific employee. (Dkt. 1, at 10.) On November 2, 2007,

o

Defendants removed to this Court on the basis of diversity jurisdiction.[1] (Dkt. 1.)

On September 19, 2008, Defendants filed a motion for summary judgment. (Dkt. 21.) In his response, Alvarado conceded that summary judgment was proper on his national origin and retaliation claims, and those claims were dismissed by the Court. (Dkt. 22, at 24; Dkt. 25.) On March 26, 2010, the Court denied Defendants' motion for summary judgment, without prejudice, on the remaining age discrimination and defamation claims. (Dkt. 29.) That same day the Court reopened discovery for 60 days and ordered the parties to file either an amended/supplemental motion for summary judgment, or a joint pretrial order, by June 1, 2010. (Id.) Alvarado filed a motion for summary judgment on April 8, 2010, and Defendants filed a supplemental motion for summary judgment on May 11, 2010. (Dkt. Nos. 30, 35.)

<u>FACTUAL BACKGROUND</u>

Alvarado was hired by Missouri Pacific Railroad in 1976. (Dkt. 22, Attach. 1, at 2.) He worked there until 1997, when

---

[1] Removal was defective because Gorton, a defendant, is a citizen of Texas. <u>See</u> 28 U.S.C. § 1441(b). Nevertheless, Alvarado waived that defect by failing to file a timely motion to remand. (Dkt. 12.)

Missouri Pacific merged with Union Pacific.[2] (Id.) After the merger, he became a Union Pacific employee and has worked there ever since. (Id.) He has held a variety of positions within the company and has received multiple promotions and achievement awards. (Id.) By 2006, he was a Senior Manager of Terminal Operations in Laredo, Texas, a position he acquired in 2004. (Id.)

In 2006, Alvarado was placed on two personal development plans ("PDPs").[3] (Dkt. 21, Attach. 1, at 3-4.) Although the policies guiding their use are not discussed in the record, PDPs appear to be a formal disciplinary tool used by Union Pacific management. Gorton, the General Superintendent of the San Antonio Service Unit, testified that if there is a discrepancy with an employee's performance, he/she can be placed on a one month PDP. (Dkt. 21, Attach. 1, at 26.) If after the first PDP the employee's performance does not improve, the employee can be placed on a second PDP, this time lasting six months. (Id.) If the performance issues continue after the second PDP, the employee is subject to termination. (Id.)

---

[2]   See   Union   Pacific,   Missouri   Pacific   Railroad, http://www.uprr.com/aboutup/history/heritage/mopac.shtml (last visited April 25, 2011).

[3] One plan is dated February 1, 2006, the other September 15, 2006. (Dkt. 21, Attach. 1, at 3-4.)

°

The performance issues causing Alvarado to be placed on the 2006 PDPs are not discussed in the record.[4] The PDPs themselves shed little light on the question. The February and September PDPs are essentially identical, each listing the same eleven goals.[5] (Id. at 3-4.) Seven of the goals are listed under a "FTX/RCO Activities" heading, and four of the goals are listed under a "Professionalism" heading.[6] (Id.) The first goal under

---

[4] Gorton did testify, without elaboration, that Alvarado's PDPs indicated that he had "honesty issues." (Dkt. 35, Attach. 1, at 2.)

[5] Both PDPs instruct Alvarado to "[r]espond to all lotus notes and voice mails from senior managers" within a specified number of days. (Dkt. 21, Attach. 1, at 3-4.) The February PDP requires a response within five days and the September PDP requires a response within three days. (Id.) This is the only difference between the two PDPs.

[6] The FTX/RCO Activities goals are:

> (1) 20 FTX observations per month. Minimum of 5 per week for any given point during the month which are due in system each Saturday. (2) 10 FTX assists each month. (3) Testing in accordance with the monthly service unit FTX plan. (4) Two team testing events per month. (5) 10 RCO tests per month – 5 due in system by 15th of each month. (6) Certification by date required. Any changes or adjustments performed in advance. Minimum 2 RCO rides per month.

The Professionalism goals are:

> (1) Be 100% truthful in all business dealings. (2) Respond to all Lotus notes and voice mails from senior managers with [3/5] days. Exceptions will be made for vacations. (3) Don't be the victim – Take responsibility for your actions. (4) While on duty spend your time performing company business.

○

the "Professionalism" heading is to "[b]e 100% truthful in all business dealings." (Id.) Prior to 2006, Alvarado had never been placed on a PDP. (Id. at 23.)

Alvarado testified that in November, 2006, during his Thanksgiving holiday, he and his wife traveled to Monterrey, Mexico to spend time with his wife's family after a recent death. (Dkt. 22, Attach. 1, at 3.) He was scheduled to return to work on November 26. (Id.) On November 25, at approximately 10:50 p.m., he called his supervisor, Carlos Mata ("Mata"), on his office phone and left a voicemail stating that he would not be at work the next day due to a family emergency.[7] (Id.)

According to Alvarado, he returned to Laredo the following day, November 26. He testified that he crossed the United States–Mexico border at approximately 4:50 p.m. (Id.) At approximately 6:00 p.m., he used his company cell phone to call Cesar Trevino, a Manager of Terminal Operations in Laredo, to determine whether he needed to go into work that day. (Id.) He spoke with Trevino and, based on their conversation, believed that he did not need to go into work. (Id.) Alvarado missed work

_____

(Id.)

[7] Mata is the Director of Terminal Operations in Laredo. (Dkt. 22, Attach. 1, at 3.) Alvarado testified that he called Mata from the phone in his hotel room, and that he did not bring his company cell phone on the trip because it did not work in Mexico. (Id.)

o

on November 26, but did not miss any additional work days after that. (See Dkt. 21, Attach. 1, at 25.)

Mata told Gorton about Alvarado's absence on November 26, and about the voicemail he left on the evening of November 25. (Dkt. 35, Attach. 1, at 2.) As the General Superintendent, Gorton is the highest ranking manager in the service unit and has the authority to hire and fire management employees.[8] (Id. at 1; Dkt. 21, Attach. 1, at 8.) On December 11, 2006, Gorton met with Alvarado and instructed him to provide documentation substantiating his explanation for missing work.[9] (Dkt. 22, Attach. 1, at 3.) Gorton gave Alvarado a letter stating in part:

> One of the conditions of your PDP listed under
> "Professionalism" – item #1 was to be 100% truthful in
> all business dealings. Due to the circumstances
> involving your absence, I am hereby instructing you to
> provide documentation in order to substantiate your
> claim regarding the death of someone in your wife's
> family within 24 hours. You must provide this
> information to me within 24 hours of receipt of this
> letter. If you do not provide this documentation
> within 24 hours, you will be subject to disciplinary
> action up to and including termination of your
> management responsibilities.

(Id. at 40.)

---

[8] Gorton became the General Superintendent of Union Pacific's San Antonio Service Unit in October, 2006. (Dkt. 35, Attach. 1, at 1.)

[9] Gorton claims that Alvarado stated he had been in Mexico on November 26 during their December 11 meeting, but had earlier told Mata that he had been in Fort Worth. (Dkt. 21, Attach. 1, at 13–14.) Mata's deposition was taken, but Defendant provides no evidence that Mata corroborates Gorton's assertion.

○

Alvarado provided a death certificate within 24 hours. (Dkt. 22, Attach. 1, at 3, 18.) He also provided receipts showing that an "Enrique Alvarado" stayed at a hotel in Monterrey, Mexico on November 24, 25, and 26. (Id. at 29–31, 45.) Gorton testified that he inspected the death certificate and it appeared to have been altered. (Dkt. 35, Attach. 1, at 2.) He stated that his primary concern was that the handwritten twos in the date near the signature line "were different than the twos that were on the rest of the death certificate."[10] (Dkt. 21, Attach. 1, at 18.) He was similarly unconvinced by the hotel receipts. When asked about the receipts in his deposition, Gorton suggested that Alvarado's family could have acquired the receipts while in Mexico without Alvarado.(Id.)

Gorton testified that after receiving the death certificate and hotel receipts, he asked Vonda Crawley ("Crawley"), a Union Pacific employee, to determine whether Alvarado used his company cell phone while on vacation, and if so, where he was using it.[11] (Id.) He wanted Crawley to establish Alvarado's location by determining the location of the cell phone towers his phone utilized on any calls made during those particular days. (Id. at

---

[10] Gorton stated that he was also skeptical about "the age of the employee" on the death certificate. (Id. at 18.) The Court finds nothing explaining to what "employee" Gorton was referring.

[11] Crawley is the Director of Operations Support for Union Pacific's San Antonio Service Unit. (Dkt. 35, Attach. 2, at 1.)

○

19.) Gorton testified that he eventually received phone records showing that Alvarado used his company cell phone in Corpus Christi, Texas, on November 26, and that based on those records, he decided to terminate Alvarado's employment. (<u>Id</u>. at 16.)

On December 27, 2006, Gorton and three other Union Pacific managers met with Alvarado. (Dkt. 35, Attach. 1, at 3-4.) Gorton gave him the following termination letter, the details of which were verbally communicated in the presence of the other managers: (Dkt. 22, Attach. 1, at 27-28.)

> As previously discussed, one of the conditions of your PDP listed under "Professionalism" – item #1 was to be 100% truthful in all business dealings. During my meeting with you on December 11, 2006, I questioned you regarding your absence from work and why you did not contact Carlos Mata. You claimed to have been in Mexico without your company cell phone, but the Company phone records indicate that you were in Corpus Christi, TX. It is clearly evident that you have not be [sic] 100% truthful regarding the circumstances related to your absence from work on Sunday, November 26th.

> For these aforementioned reasons, you are being removed from your position as a Sr. Manager of Terminal Operations immediately.

(<u>Id</u>. at 43.)

On December 28, 2006, Gorton composed an e-mail summarizing the meeting with Alvarado, and the reasons for his termination, and sent it to nine Union Pacific employees. (<u>Id</u>. at 41-42.) It appears that the e-mail was forwarded to three additional Union Pacific employees. (<u>Id</u>. at 41.)

Alvarado was 52 years old when he was fired. (See id. at 2.) Gorton hired Charlie Gonzalez, 35 years old at the time, as his replacement. (Id. at 13, 122.) After his termination, Alvarado exercised his seniority with the employee union and took a nonmanagement position with Union Pacific as a Car Foreman in Shreveport, Louisiana. (Id. at 3.) He is paid significantly less as a Car Foreman than he was as a Senior Manager of Terminal Operations. (Id.) Alvarado filed a charge of discrimination with the Equal Employment Opportunity Commission and received a right-to-sue letter in July, 2007. (Dkt. 3, at 43.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law.". Sossamon v. Lone Star State of Tex., 560 F.3d 316, 326 (5th Cir. 2009) (quoting Hamilton v. Segue Software, Inc., 232 F.3d 473, 477 (5th Cir. 2000)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." Id. (quoting Hamilton, 232 F.3d at 477). In determining whether a fact issue exists, the Court views "the facts and the

inferences to be drawn therefrom in the light most favorable to the nonmoving party." Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co., 336 F.3d 410, 412 (5th Cir. 2003).

The moving party bears the initial burden of showing that there is no genuine fact issue. Condrey v. Sun Trust Bank of Ga., 429 F.3d 556, 562 (5th Cir. 2005) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Where the burden of proof at trial rests on the nonmovant, the movant may satisfy its initial burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325; see also Cuadra v. Hous. Indep. Sch. Dist., 626 F.3d 808, 812 (5th Cir. 2010). "Once the moving party has demonstrated the absence of a material fact issue, the non-moving party must 'go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.'" Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)). This burden is not satisfied with conclusory allegations, unsubstantiated assertions, or by establishing "some metaphysical doubt as to the material facts." Id. (quoting Little, 37 F.3d 1075). Rather, the nonmoving party "is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." Ragas v. Tenn. Gas Pipeline Co., 136 F.3d

o

455, 458 (5th Cir. 1998). If the evidence produced by the nonmovant "is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249–50 (1986) (citations omitted).

<u>DISCUSSION</u>

A. Defendants' Motion for Summary Judgment

1. Alvarado's Age Discrimination Claim

(a) Title VII's Burden-Shifting Framework Applies to Claims Under the TCHRA.

Under the TCHRA, an employer may not discriminate against an employee on the basis race, color, disability, religion, sex, national origin, or age. Tex. Lab. Code Ann. § 21.051 (West 2006). The Texas Legislature adopted the Act "to correlate state law with federal law in employment discrimination cases." <u>Ysleta Indep. Sch. Dist. v. Monarrez</u>, 177 S.W.3d 915, 917 (Tex. 2005); <u>see also</u> Tex. Lab. Code Ann. § 21.001 (West 2006)("The general purposes of this chapter are to . . . provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 . . . ."). As such, Texas state courts look to federal precedent when interpreting the Act's provisions. <u>Monarrez</u>, 177 S.W.3d at 917.

At the summary judgment stage, TCHRA claims are reviewed under the same burden-shifting framework applied in Title VII

discrimination cases. Machinchick v. PB Power, Inc., 398 F.3d 345, 356 (5th Cir. 2005); see also Shackelford v. DeLoitte & Touche, LLP, 190 F.3d 398, 404 n.2 (5th Cir. 1999) ("[T]he law governing claims under the TCHRA and Title VII is identical."). This framework, which was established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and later modified by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), and Rachid v. Jack in the Box, Inc., 376 F.3d 305 (5th Cir. 2004), has three phases.

The plaintiff must first demonstrate a prima facie case of discrimination. Machinchick, 398 F.3d at 352. In an age discrimination case, this requires proof that the plaintiff: "(1) is a member of [the] protected class; (2) was discharged; (3) was qualified for the position from which she was discharged; and (4) was either replaced by someone outside the protected class, replaced by someone younger, or was otherwise discharged because of her age." Id. at 356 (quoting Russo v. Smith Int'l, Inc., 93 S.W.3d 428, 435 (Tex. App.—Houston [14th Dist.] 2002, pet. denied)). If the plaintiff makes a prima facie showing, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. Id. Defendant's burden at this stage is one of production, not persuasion, and can involve no credibility assessment. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000). If the defendant meets its burden of production, the

burden shifts back to the plaintiff to provide sufficient evidence to create a fact issue that (1) the defendant's proffered nondiscriminatory reason is not true, but rather a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, "while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive alternative)." Machinchick, 398 F.3d at 352 (quoting Rachid, 376 F.3d at 312).

In a pretext analysis, a plaintiff can survive summary judgment by creating a fact issue as to the falsity of the employer's alleged nondiscriminatory reason. Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir. 2002); see also Moss v. BMC Software, Inc., 610 F.3d 917, 922 (5th Cir. 2010) ("A plaintiff may show pretext . . . 'by showing that that employer's proffered explanation is false or unworthy of credence.'" (quoting Jackson v. Cal-Western Packaging Corp., 602 F.3d 374, 378-79 (5th Cir. 2010))). The issue becomes whether the defendant's alleged nondiscriminatory reason, even if incorrect, was the real reason for the defendant's employment action. Sandstad, 309 F.3d at 899. In other words, "a fired employee's actual innocence of his employer's proffered accusations is irrelevant as long as the employer reasonably

believed it and acted on it in good faith." <u>Cervantez v. KMGP</u> <u>Servs. Co.</u>, 349 Fed. Appx. 4, 10 (5th Cir. 2009).

(b) The Causation Standard for Claims Under the TCHRA

Both parties agree that "but for" is the proper causation standard for this claim in light of the Supreme Court's holding in <u>Gross v. FBL Fin. Servs., Inc.</u>, 129 S. Ct. 2343 (2009), and that a mixed motive standard should not be used. (Dkt. 30, at 2, 9-10; Dkt. 34, at 2.) Although that issue might be unsettled, the Court is denying summary judgment and therefore need not take a position on the issue at this time.

(c) Defendant's Nondiscriminatory Reason

Defendant concedes that Alvarado has set forth a prima facie case of age discrimination. (Dkt. 37, at 1.) Thus, the Court proceeds to address Defendant's burden of producing a legitimate, nondiscriminatory reason for the adverse employment action. Defendants have met this burden. The December 27, 2006 termination letter plainly states that Alvarado was fired because the company cell phone records showed that he was dishonest about his whereabouts on November 26, 2006. (Dkt. 22, Attach. 1, at 43.) In that letter, Gorton asserts that the phone records indicated Alvarado was in Corpus Christi that day, not returning from Mexico as he had claimed. (<u>Id.</u>) When asked in his

o

deposition about the role the phone records played in his decision to fire Alvarado, Gorton explained:

> Q. Did you see the records?
>
> A. I did. I wouldn't have made this decision if I didn't.
>
> Q. That was my next question. Was your decision based on those records?
>
> A. It was. The final decision was based on those records.

(Dkt. 21, Attach. 1, at 16.)

(d) Evidence of Pretext

Alvarado must now raise a fact issue as to whether Defendant's nondiscriminatory reason is false or unworthy of credence. Moss, 610 F.3d at 922.

Alvarado deposed Heather Ramos ("Ramos"), a subpoena analyst for Sprint Nextel ("Sprint"). Ramos's duties include interpreting Sprint phone records for attorneys and law enforcement personnel. (Dkt. 22, Attach. 1, at 70.) Ramos testified that, according to Sprint's records, there were only two phone calls associated with Alvarado's company cell phone on November 26, 2006.[12] (Id. at 77.) There was an inbound call at

---

[12] In the deposition testimony provided, Alvarado's attorney asks Ramos about incoming and outgoing calls on "that number" on November 26, 2006. (Dkt. 22, Attach. 1, at 75–77.) Alvarado, however, provided no testimony specifically identifying "that number." Nevertheless, taking the evidence and the inferences therefrom in the light most favorable to Alvarado, and based on

7:11 a.m., and an outbound call at 6:08 p.m. (<u>Id</u>.) Both calls utilized a cell phone tower located in Laredo, Texas for the entirety of the call.[13] (<u>Id</u>. at 76-77, 91.) Therefore, based on Sprint's records, there was no indication that Alvarado used his cell phone in Corpus Christi on November 26, 2006.

Evidence that Gorton was incorrect in his proffered reason for terminating Alvarado makes it increasingly important that there be some reasonable basis for Gorton's having formed that incorrect belief. <u>See Bauer v. Albemarle Corp.</u>, 169 F.3d 962, 967 (5th Cir. 1999) (noting that defendant's nondiscriminatory reason need not be proved true so long as it is reasonable, and not arbitrary). When asked about the phone records on which he based his belief, Gorton's responses were inconsistent:

> Q. And how was the information communicated to you about where he used his cell phones?
>
> A. That was transmitted – I believe it was Sprint. Was it the Sprint service? I don't recall it right now. That was – Vonda talked to somebody in Sprint or had somebody talk to somebody in Sprint and they faxed us the phone records of that particular phone of where it was being used in that particular time frame that I requested.
>
> Q. And when you say "records," are you talking about this bill?

---

the pleadings, the Court infers that the calls discussed were made to and from Alvarado's company cell phone.

[13] Ramos testified that cell phone towers generally have an operational radius of zero to five miles, meaning that a caller must be no more than five miles from a tower in order to use it to place a call. (<u>Id</u>. at 72, 79.)

A. No, the bill would not. It would tell you what numbers, but it would not tell you what tower he was using.

Q. Okay.

A. The record itself, you have to get that directly from the Sprint Company.

Q. Okay. And are you talking just an e-mail, or are you saying actual records?

A. There was records produced that had numerous phone calls and what towers they used.

Q. Did you see the records?

A. I did. I wouldn't have made this decision if I didn't.

Q. That was my next question. Was your decision based on those records?

A. It was. The final decision was based on those records.

Q. And what did the records look like?

A. The records looked like he was using his phone, or that that phone was being used in Corpus Christi.

(Dkt. 21, Attach. 1, at 15–16.) After this exchange, Alvarado's attorney stated that the only thing he had received constituting cell phone tower records was a series of e-mails. (Id. at 17.) He provided the e-mails to Gorton and the following exchange occurred:

Q. Is that the entirety of the proof that you recall seeing?

A. I believe so.

ₒ

Q. So there wasn't a series – it was e-mails?

A. Apparently so.

Q. Okay.

A. So much for my good memory, huh?

(Id.)

These e-mails are discussed, and attached to, Crawley's May, 2010 declaration. (Dkt. 35, Attach. 2.) In that declaration Crawley testified that in late 2006, Gorton asked her to determine where Alvarado used his company cell phone on November 26, 2006, and that she requested that information, via e-mail, from a Sprint employee. (Id. at 1–2.) Crawley stated that she received an e-mail from a Sprint employee stating that Alvarado used the phone in Corpus Christi on November 26, and that she relayed that information to Gorton. (Id. at 2.)

The attached e-mails, however, are disjointed and unclear. (See id. at 4–9.) They refer generally to various phone calls and dates, but do not establish that someone from Sprint stated that Alvarado's company cell phone was used in Corpus Christi, Texas on November 26, 2006. They certainly do not resemble the records described by Gorton, which contained "numerous phone calls and [the] towers they used." (Dkt. 21, Attach. 1, at 16.) For example, the only e-mail that mentions Corpus Christi states in full: "Vonda, Corpus Christi, Texas is location. Kim." (Dkt. 35, Attach. 2, at 7.) That e-mail appears to be a response to an

e-mail from Crawley asking for the location of "Tower TX613 BB Loop NPI." (Id.) That tower, however, is not discussed in any of the other e-mails, making any relationship between it, and the calls from Alvarado's cell phone on November 26, 2006, entirely unclear.

Considering Ramos's testimony, Gorton's inconsistent statements, and the absence of some coherent basis for Gorton's belief that Alvarado was in Corpus Christi on November 26, 2006, the Court concludes there is a fact issue as to the credence of Defendant's nondiscriminatory reason for terminating Alvarado.

2. Alvarado's Defamation Claim

    (a) Statements at Issue

Alvarado's defamation claim is based on statements Gorton made at the December 27, 2006 meeting where he fired Alvarado, and in a e-mail he sent on December 28, 2006. (Dkt. 22, at 17–18.) The statement at issue from the December 27 meeting is in Alvarado's termination letter:

> During my meeting with you on December 11, 2006, I questioned you regarding your absence from work and why you did not contact Carlos Mata. You claimed to have been in Mexico without your company cell phone, but the Company phone records indicate that you were in Corpus Christi, TX. It is clearly evident that you have not be [sic] 100% truthful regarding the circumstances related to your absence from work on Sunday, November 26th.

o

(Dkt 22, Attach. 1, at 43.) As mentioned, Gorton testified that he verbally communicated the details of this letter to Alvarado in the presence of three Union Pacific employees. (<u>Id</u>. at 27–28.)

The statement at issue in the December 28 e-mail is very similar. That e-mail states in relevant part:

> I requested Mr. Alvarado's cell phone records from the phone company to verify that his cell phone was not used on that day as he claimed, and if the phone was used, where were the calls being made from. The records were received on December 23, 2006 and proved that Mr. Alvarado did indeed use his phone on that day, and he was not in Mexico, but that his phone was in use in Corpus Christi, TX.

(<u>Id</u>. at 41–42.) Gorton sent the e-mail to nine Union Pacific employees. (<u>Id</u>. at 41.) It appears that the email was then forwarded to three additional Union Pacific employees. (<u>Id</u>.)

(b) Applicable Law

Under Texas law, to establish a claim for defamation a plaintiff must prove that "(1) the defendant published a factual statement (2) that was capable of defamatory meeting (3) concerning the plaintiff (4) while acting with either negligence, if the plaintiff is a private individual, or actual malice, if the plaintiff is a public figure or a public official, concerning the truth of the statement." <u>Vice v. Kasprzak</u>, 318 S.W.3d 1, 12 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing <u>WFAA-TV, Inc. v. McLemore</u>, 978 S.W.2d 568,

o

571 (Tex. 1998)). A statement is defamatory if it injures a person's reputation, "exposing the person to public hatred, contempt, ridicule, or financial injury, or if it tends to impeach that person's honesty, integrity, or virtue." Means v. ABCABCO, Inc., 315 S.W.3d 209, 214 (Tex. App.—Austin 2010, no pet.) (citing TEX. CIV. PRAC. & REM. CODE § 73.001, the statutory definition of libel). There are two types of defamation claims. A defamatory statement verbally communicated to a third person is slander, while a defamatory statement published in written form is libel. Austin v. Inet Techs., Inc., 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.). Truth is an absolute defense to a claim of defamation. Pardo v. Simons, 148 S.W.3d 181, 186 (Tex. App.—Waco 2004, no pet.).

Employers have a qualified privilege that attaches to statements made in the course of an investigation following a report of employee wrongdoing. Richard Rosen, Inc. v. Mendivil, 225 S.W.3d 181, 195 (Tex. App.—El Paso 2005, pet. denied). The privilege exists so long as the statements were made only to persons having an interest or duty in the matter to which the statements relate. Id. The privilege is defeated, however, by a showing that the statements were made with actual malice. Id. In the context of defamation, actual malice exists when a statement is made with knowledge of its falsity or with reckless disregard of its truth. Wal-Mart Stores, Inc. v. Lane, 31 S.W.3d 282, 289

o

(Tex. App.—Corpus Christi 2000, pet. denied) (quoting Randall's Food Markets, Inc. v. Johnson, 891 S.W.2d 640, 646 (Tex. 1995)). To invoke the qualified privilege at the summary judgment stage, "an employer must conclusively establish that the allegedly defamatory statement was made with an absence of [actual] malice." Austin, 118 S.W.3d at 496.

    (c) Analysis

    Defendants make two arguments for summary judgment. They argue that the alleged defamatory statements are Gorton's opinion, not factual assertions, and that even if they are factual, they are covered by the qualified privilege discussed above. (Dkt. 23, at 4-5.)

    Whether a statement is one of opinion or fact is a question of law for the Court. Shaw v. Palmer, 197 S.W.3d 854, 857 (Tex. App.—Dallas 2006, pet. denied). In making that determination, the Texas Supreme Court looks to the statement's verifiability and the context in which it was made. Bentley v. Bunton, 94 S.W.3d 561, 579-84 (Tex. 2002). Using these factors as a guide, Gorton's statements are clearly factual. His assertion that the company phone records showed that Alvarado was in Corpus Christi, and not in Mexico as had claimed, is verifiable and entirely unambiguous in its meaning.

°

Defendants' argument for summary judgment based on the qualified privilege also fails. Again, a defendant seeking to invoke the privilege at the summary judgment stage must conclusively establish that the alleged defamatory statement was made without actual malice. Austin, 118 S.W.3d at 496. That is, the defendant must prove that the statement was not made with knowledge of its falsity or with reckless disregard of its truth. See Lane, 31 S.W.3d at 289.

Here, the assertion at issue in the alleged defamatory statements—that the company phone records proved that Alvarado had been dishonest about his whereabouts on November 26—is also Union Pacific's nondiscriminatory reason for terminating Alvarado in the age discrimination claim. The Court has already determined that an issue of fact exists as to the falsity of that nondiscriminatory reason. Thus, a fact issue also exists as to whether that assertion was made with actual malice.

The Court makes no decision whether the Union Pacific employees to whom the statements were communicated had an interest or duty in the subject matter, but does note that Defendants' position on this issue is somewhat conclusory.

B. Plaintiff's Motion for Summary Judgment

In his motion for summary judgment, Alvarado requests that the Court "grant summary judgment on the Defendant['] alleged

non-discriminatory reason offered for his termination." (Dkt. 30, at 1.) It is not clear what Alvarado means by that request. Suffice to say the Court has already found that a fact question exists as to the falsity of Defendant's proffered non-discriminatory reason for the adverse employment action. If Alvarado is asking the Court to find that the proffered reason is false as a matter of law, the Court declines to do so.

With respect to the defamation claim, Alvarado moves for summary judgment "on Defendants' claim of qualified privilege." (Dkt. 30, at 1.) He argues that Defendants have not shown that the individuals to whom the allegedly defamatory statements were communicated fall within the privilege. (Id. at 20.) He also argues that the privilege should not apply at this stage because Defendants cannot conclusively establish that the alleged defamatory statements were made with an absence of malice. (Id. at 21.) Again, the Court has determined that a fact issue exists as to the applicability of the qualified privilege, but declines to find as a matter of law that there was no privilege.

                              CONCLUSION

For the foregoing reasons, the parties' motions for summary judgment (Dkt. Nos. 30, 35) are DENIED. Plaintiff's objections to evidence attached to Defendants' supplemental motion for summary judgment (Dkt. 39) are DENIED as moot. The parties are

now ORDERED to file their joint pretrial order no later than May 17, 2011.

DONE at Laredo, Texas, this 26th day of April, 2011.

George P. Kazen
Senior United States District Judge